NOTICE

Decision filed 02/27/24. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2024 IL App (5th) 220718-U

NO. 5-22-0718

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Champaign County. |
| | ) | |
| v. | ) | No. 18-CF-1693 |
| | ) | |
| JAMES E. WILEY, | ) | Honorable |
| | ) | Roger B. Webber, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE VAUGHAN delivered the judgment of the court.
Justices Welch and Cates concurred in the judgment.

**ORDER**

¶ 1    *Held*: We grant defendant's appointed counsel on appeal leave to withdraw and affirm the circuit court's order dismissing three postconviction claims at the second stage of proceedings and judgment denying the remaining postconviction claim after an evidentiary hearing, where no error stems from either the order or the judgment and no argument claiming error has merit.

¶ 2    Defendant, James E. Wiley, appeals the trial court's August 25, 2022, order dismissing three of his postconviction claims at the second stage and its November 3, 2022, judgment denying his remaining postconviction claim following an evidentiary hearing. Defendant's attorney on appeal, the Office of the State Appellate Defender (OSAD), concluded this appeal lacks merit and filed a motion for leave to withdraw as counsel pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987). The motion was accompanied by a memorandum of law in support thereof. OSAD provided proper notice to defendant. Defendant requested, and this court provided, additional time

1

to file a brief, memorandum, or other document explaining why OSAD should not be allowed to withdraw as counsel, or why this appeal has merit. However, no response was filed by defendant and the extended deadline for submission expired. Having reviewed OSAD's *Finley* motion, the accompanying memorandum of law, as well as the entire record on appeal, we conclude this appeal lacks merit. Accordingly, we grant OSAD leave to withdraw as counsel and affirm the circuit court's order dismissing three allegations in defendant's amended postconviction petition and judgment denying one allegation following an evidentiary hearing.

¶ 3                          BACKGROUND

¶ 4      On December 10, 2018, defendant was charged, by information, with four counts of home invasion. See 720 ILCS 5/19-6(a)(3), (a)(4) (West 2018). The charges claimed defendant entered Clarissa Head's dwelling and, while armed with a firearm: (1) threatened the imminent use of force upon Willie Barry; (2) struck Clarissa Head in the face; (3) pointed the firearm at Clarissa Head and Melvin Armstrong; and (4) personally discharged the firearm during the commission of the offense. The four home invasion counts were Class X felonies. See *id.* § 19-6(c). In addition to the potential Class X prison sentence of 6 to 30 years (730 ILCS 5/5-4.5-25(a) (West 2018)), one count carried a mandatory sentence enhancement of 15 years, and the other three counts carried a mandatory sentence enhancement of 20 years. 720 ILCS 5/19-6(c) (West 2018).

¶ 5      On January 14, 2019, the State filed an additional charge, by information, against defendant alleging unlawful possession of weapons by a felon (*id.* § 24-1.1). Said offense was a Class 3 felony punishable by imprisonment for a term of 2 to 10 years, depending on whether extended term sentencing applied. *Id.* § 24-1.1(e); 730 ILCS 5/5-4.5-40(a) (West 2018).

¶ 6      The public defender's office was originally appointed to represent defendant. However, private counsel was later retained, and a jury trial was scheduled for August 26, 2019.

2

¶ 7     On August 26, 2019, defendant's attorney filed a motion to continue the trial. He stated, *inter alia*, that he "[had] not slept for three days" and that, during the previous week, the State had tendered evidence that "disrupted" his trial strategy and "forc[ed] a complete reworking of the case." The State objected. The circuit court heard arguments then announced that it would rule on the motion the next day.

¶ 8     Later that same day, the parties informed the court that the State made a new plea offer, one involving a new charge of being an armed habitual criminal, and that defendant was considering the offer. The court informed defendant about his trial rights as well as the four home invasion charges and their possible penalties.

¶ 9     On August 27, 2019, the parties appeared before the circuit court and announced they reached a negotiated plea agreement. The State filed a new count charging defendant with the offense of being an armed habitual criminal (see 720 ILCS 5/24-1.7(a) (West 2018)), which was a Class X felony. See *id.* § 24-1.7(b). The new charge accused defendant of possessing a .22 rifle on December 7, 2018, after being convicted of attempted murder, a Class X felony, in Cook County case No. 05-CR-1584, and aggravated battery, a Class 3 felony, in Cook County case No. 03-CR-100101. The court admonished defendant on the nature of the new charge, and also informed him that the offense was punishable by 6 to 30 years of imprisonment, to be followed by 3 years of mandatory supervised release (MSR). Defendant indicated his understanding of the new charge and the possible penalties. The described terms of the plea agreement indicated defendant would plead guilty to the new offense and would be sentenced to 15 years in prison, to be followed by 3 years of MSR, with credit for 264 days previously served in jail, while the five other counts against defendant would be dismissed. Defendant agreed that the plea agreement was as described.

¶ 10    The court admonished defendant that if he entered a plea of guilty, he would be "giving up several very important rights." These rights included the right to a public trial, whether by a jury or by the judge alone, the right to compel the appearance of witnesses on his behalf, the right to present evidence, the right to confront and cross-examine the prosecution's witnesses, the right to testify or not to testify, as he alone chose, the right to the assistance of counsel throughout, and the right to insist that the prosecution prove guilt beyond a reasonable doubt. Defendant indicated his understanding of all these rights, advised that he did not have any questions about them, and further acknowledged that by pleading guilty, he would be surrendering all of those rights, except the right to counsel. Defendant affirmed his signature on a jury-waiver form and stated he had no questions.

¶ 11    When the court asked him how he wished to plead to the charge of armed habitual criminal, defendant answered, "Guilty." When the court asked him whether he was pleading guilty on his "own free will," he responded, "Yes, sir." The court asked whether anyone forced, threatened, or coerced him "in any way" in order to "get [him] to plead guilty," and defendant replied, "No, sir."

¶ 12    The State presented a factual basis for the plea stating that on December 7, 2018, police were called to investigate "reports of shots fired." During the investigation, the police determined defendant was a suspect and surrounded his residence. "After several hours of negotiation," defendant surrendered. Police found a 9-millimeter handgun in defendant's basement and a .22 rifle in a detached garage. The State also averred that it would present certified copies of defendant's prior convictions for attempted murder and aggravated battery. Defense counsel, and defendant himself, both concurred that the State's evidence would be substantially as described. The court asked the prosecution about defendant's prior convictions, other than those mentioned in the charging instrument. The State responded that defendant was convicted of conspiracy to

4

commit unlawful use of a weapon by a felon in a 2015 case, and unlawful possession of a controlled substance in a 1998 case. The parties waived the right to a presentence report.

¶ 13    The court accepted the plea, found a factual basis, found the plea was knowingly, intelligently, and voluntarily provided, and entered judgment on the plea. The court sentenced defendant to 15 years in prison, to be followed by 3 years on MSR, for the offense of armed habitual criminal, with credit for 264 days previously served. The court dismissed the other five counts against defendant. The court admonished defendant about his appeal rights, including the need to file a motion to withdraw his plea, and defendant indicated his understanding. The court signed a sentencing order, reflecting the sentence imposed and the credit granted. Defendant never moved to withdraw his guilty plea and no appeal was taken from the judgment of conviction.

¶ 14    On March 26, 2021, defendant filed a *pro se* petition for postconviction relief. He claimed that (1) one of his prior convictions, which served as a predicate offense for armed habitual criminal, was based on a statute that violated the federal constitution, as held by our supreme court, and (2) private counsel provided constitutionally ineffective assistance (i) by inaccurately informing him that Melvin Armstrong and Clarissa Head, two of the victims of the original home invasion counts, were set to testify against defendant, whereas, in reality, Armstrong told police that he could not see the perpetrator's face, and Head later recanted her statement to police identifying defendant as the perpetrator, and (ii) by "urg[ing]" him to accept a guilty plea to an offense based on a statute "that is unconstitutional in its entirety." He requested the appointment of postconviction counsel and an order vacating the judgment of conviction.

¶ 15    Attached to the *pro se* postconviction petition was, *inter alia*, an affidavit from Clarissa Head, dated May 2, 2019. The affidavit was hand-written, and stated the following:

"1. I'm sorry I thought that was him, but it was the wrong person. 2. I do not want to go to court. I just want everything to be over with. I thought he broke into my house, but he didn't. 3. I am sorry for everything. I just want everything to be over."

¶ 16    On June 4, 2021, the circuit court ordered the petition docketed for further consideration and appointed postconviction counsel. On March 7, 2022, postconviction counsel filed an amended postconviction petition presenting four claims of constitutionally ineffective assistance by plea counsel. The petition claimed plea counsel was ineffective (1) by failing to inform defendant that two crucial State's witnesses, Melvin Armstrong and Clarissa Head, were unreliable and incredible, and by failing to show him "any discovery," both of which "left [defendant] at a disadvantage" when considering whether to accept the State's plea offer or to proceed to trial; (2) by "abandon[ing] his trial strategy," which caused defendant to accept the proposed plea agreement; (3) by failing to file a pretrial motion to suppress evidence of a rifle that the police found during a search, where defendant was asleep at the time the police arrived at his house, defendant's latent fingerprints were not found on the rifle, there were three other individuals at the house when police arrived, and the police found the rifle in a detached garage, *i.e.*, in a structure apart from the house where defendant was found; and (4) by completely failing to subject the prosecution's case to meaningful adversarial testing. Attached to the amended postconviction petition was the hand-written May 2, 2019, affidavit of Clarissa Head, that was previously attached to defendant's *pro se* petition.

¶ 17    Postconviction counsel also filed a certificate pursuant to Illinois Supreme Court Rule 651(c) (eff. July 1, 2017). Counsel attested that she had performed her required duties, *i.e.*, that she (1) "consulted with the [defendant] by phone, mail, electronic means or in person to ascertain his contentions of deprivation of constitutional rights"; (2) "examined the record of the

proceedings at the trial"; and (3) "made any amendments to the petition filed *pro se* that [we]re necessary for an adequate presentation of the [defendant's] contentions."

¶ 18    The State filed a motion to dismiss the amended postconviction petition. The motion alleged that defendant failed to make a substantial showing of plea counsel's ineffectiveness for any of the claims.

¶ 19    On August 25, 2022, the parties presented for a hearing on the State's motion to dismiss. During argument, postconviction counsel conceded that she had not provided any basis for suppressing the rifle that police had found in defendant's detached garage. Following presentation of argument, the court denied the State's motion to dismiss the first ineffective-assistance claim and advanced that claim to a third-stage evidentiary hearing. The court granted the State's motion to dismiss the remaining three ineffective-assistance claims. The basis for the court's dismissal of those counts was as follows: (1) the claim concerning an alleged abandoned trial strategy lacked "specific facts to state a claim," defendant failed to "identify what the original strategy was," or "how [it] was abandoned"; (2) the claim regarding suppression of the rifle included "no facts which would support a reasonable probability that a motion to suppress might be granted"; and (3) the claim that plea counsel failed to subject the prosecution's case to meaningful adversarial testing failed to show that defendant was deprived of "fair representation."

¶ 20    On November 3, 2022, the court held a third-stage evidentiary hearing on the first claim in defendant's amended postconviction petition. Defendant and his plea counsel were the only witnesses.

¶ 21    Defendant testified that in January 2019, he hired attorney Alfred Ivy to represent him in this criminal case. During the entire course of Ivy's representation, Ivy met with defendant on only two occasions; they spoke over the phone "[a]bout three" times, and defendant "saw him a couple

7

of times in court." Ivy sometimes failed to appear for court dates. In January 2019, shortly after hiring Ivy, Ivy reviewed the discovery with defendant. It was the only time the two discussed the discovery. Ivy showed him the police reports, but defendant had to review them by himself because Ivy soon fell asleep. Defendant never saw any video evidence. Ivy never told defendant that he had spoken with any witnesses. Defendant was of the opinion that Ivy had not prepared for trial, and Ivy never did anything to prepare defendant for trial. Defendant told Ivy that he wanted a trial. Between June 4, 2019, and August 26, 2019—the date the trial was scheduled to begin—defendant met with Ivy once, in the courtroom. On that occasion, Ivy discussed, for the first time, Clarissa Head. Ivy told defendant that "things changed," and that Clarissa Head and Melvin Armstrong "was gonna *** come to court and testify," and that as a result, defendant should consider accepting the State's plea offer. To the best of defendant's knowledge, Ivy had not investigated Head or Armstrong, and Ivy had not kept defendant informed about what was happening in his case. If he had a better understanding, he would not have accepted the 15-year plea offer but instead would have chosen to go to trial. On cross-examination, defendant acknowledged knowing about Clarissa Head's affidavit—wherein she wrote that she had been wrong about who broke into her house—prior to entering his plea of guilty.

¶ 22    Alfred Ivy, defendant's plea counsel, testified that he recalled representing defendant in this case, which began with multiple counts of home invasion, each of which carried mandatory sentence enhancements that were quite lengthy. Ivy met with defendant "two or three times" at the jail and spoke with him over the telephone "[p]robably about" five times. He recalled showing defendant discovery in the case, though he did not recall any videos. It was "possible" that Ivy fell asleep as defendant examined the discovery, for there was "a lot" of discovery in this case, and Ivy always allowed his clients to review the discovery independently before he started sharing his

8

own observations. After defendant reviewed the discovery, he and Ivy discussed possible defenses. Defendant recommended calling family members as witnesses at trial, which Ivy ultimately decided to do. Along with possible defenses, the two also discussed, "from the very beginning," the possibility of a plea agreement. Ivy's conversations with the State revealed the State was unwilling to remove the sentence enhancements, which made a plea agreement unlikely in Ivy's view and therefore Ivy continued to prepare the case for trial.

¶ 23 Ivy was aware that Clarissa Head was "one of the named alleged victims" in the case, and he discussed the strengths and weaknesses of her anticipated trial testimony, from the defense perspective. For example, Head knew defendant as a neighbor, and she was expected to identify him as the perpetrator of the home invasion, which was bad for defendant's case, but Head also had a son who was involved in an argument with defendant over an alleged theft, which would be good for defendant's case. He also was aware of Melvin Armstrong, who was Head's "significant other at the time." Armstrong would have been "a good witness" for the defense, since he knew defendant as a neighbor but could not identify him as the perpetrator of the home invasion. Ivy thought Armstrong's testimony would have counterbalanced Head's testimony, at least to some degree. However, Armstrong died before defendant's trial, leaving defendant's case without the counterbalance.

¶ 24 As the trial approached, Ivy became aware that Clarissa Head wrote a statement that contradicted her prior statements about the home invasion; the new statement said she wrongly identified defendant as the perpetrator. Ivy also received a copy of a police report, wherein the police discussed an interview they conducted with Head sometime after she wrote the new statement. During that interview, according to Ivy, Head "essentially said that someone in [defendant's] family paid her to write a different statement." Ivy discussed these latest

developments involving Head's anticipated testimony with defendant, although Ivy could not recall exactly when. As a whole, Ivy told defendant these developments were not helpful to the defense. Specifically, Ivy thought the jury might blame defendant for the deceitful action of one of his family members.

¶ 25 As the time for trial arrived, Ivy saw that the State was changing its position on sentence enhancements "[p]retty significantly." The State agreed to file a charge of armed habitual criminal, which "took off the automatic 20 years *** on the [C]lass X." Defendant and his wife discussed the matter and thought a sentencing range of 10 to 12 years would be acceptable. Ivy proposed to the State a sentence of imprisonment for 10 to 12 years. The State rejected the offer, but counteroffered with a sentence of 15 years. Ivy did not explicitly recommend the State's offer. However, he "definitely recommended that [defendant] give it some serious thought." Ultimately, defendant agreed to accept the State's offer.

¶ 26 At the end of the evidentiary hearing, the circuit court found that defendant failed to establish ineffective assistance of plea counsel. The court found that every alleged failure by plea counsel was either unproven or a strategic decision by counsel. The court continued, stating that defendant "went from facing a minimum of 21 years and [a] maximum of 50 years if he were convicted on the first four counts to accepting a deal for 15 years." The court did not believe that rejecting that deal would have been "rational." The court denied defendant's postconviction petition and defendant timely appealed.

¶ 27                                    ANALYSIS

¶ 28 As previously noted, defendant's appointed appellate attorney, OSAD, moved for leave to withdraw as counsel and filed a supporting memorandum of law. The memorandum presented three potential issues on appeal. We examine each in the context of our standard of review.

10

¶ 29    A second-stage dismissal under the Post-Conviction Hearing Act (Act) is reviewed *de novo*. *People v. Pendleton*, 223 Ill. 2d 458, 473 (2006). When a petition is advanced to a third-stage evidentiary hearing, involving fact-finding and credibility determinations, the circuit court's decision will be reversed only if it is manifestly erroneous. *Id.* "[A] decision is manifestly erroneous when the opposite conclusion is clearly evident." *People v. Coleman*, 2013 IL 113307, ¶ 98.

¶ 30    OSAD's first potential issue is whether the circuit court erred when it dismissed three ineffective-assistance-of-counsel claims at the second stage of the postconviction proceeding. The three dismissed claims alleged ineffective assistance of counsel for (1) abandoning his trial strategy; (2) failing to file a pretrial motion to suppress the rifle that police had found in defendant's detached garage; and (3) failing to subject the prosecution's case to meaningful adversarial testing. The circuit court rejected the first of these claims because it failed to present "enough specific facts to state a claim." The court rejected the second claim because defendant failed to articulate any basis for suppressing the rifle. The court rejected the third claim because defendant had not alleged a complete failure by plea counsel to serve as the prosecution's adversary.

¶ 31    Claims of ineffective assistance of counsel are reviewed under the well-established "standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984)," which Illinois "adopted in *People v. Albanese*, 104 Ill. 2d 504 (1984)." *People v. Johnson*, 2021 IL 126291, ¶ 52. To prevail on a claim of ineffective assistance of counsel, a defendant must show (1) that counsel's performance was deficient and (2) the deficient performance prejudiced defendant. *Strickland*, 466 U.S. at 687. "More specifically, a defendant must show that counsel's performance was objectively unreasonable under prevailing professional norms and that there is a 'reasonable probability that,

11

but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *People v. Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "A defendant's failure to establish either prong \*\*\* precludes a finding of ineffective assistance of counsel." *People v. Henderson*, 2013 IL 114040, ¶ 11.

¶ 32    *Strickland* noted there were some circumstances so likely to prejudice the accused that prejudice need not be shown but instead would be presumed. *Strickland*, 466 U.S. at 692. Those circumstances include when (1) a defendant "is denied counsel at a critical stage," (2) counsel "entirely fails to subject the prosecution's case to meaningful adversarial testing," or (3) counsel is called upon to represent a client in circumstances under which no lawyer could provide effective assistance. *United States v. Cronic*, 466 U.S. 648, 659-60 (1984). The second *Cronic* exception is a "narrow exception" that only "infrequently" applies. *Florida v. Nixon*, 543 U.S. 175, 190 (2004).

¶ 33    Addressing the three dismissed claims, OSAD contends that no meritorious argument exists to support a claim that the circuit court's order was erroneous. OSAD states that the abandoned trial strategy claim lacked "the requisite specificity needed to demonstrate that counsel's performance was objectively unreasonable or that he was prejudiced." OSAD further concedes the claim regarding the lack of a motion to suppress the rifle "failed to identify a meritorious ground for suppression." Finally, OSAD also admits the claim about not subjecting the prosecution's case to meaningful adversarial testing failed to allege "a complete failure on the part of his attorney as was the case in *Cronic*" and the record reveals counsel eventually negotiated a lesser charge, dismissal of the five pending charges, a sentence of 15 years, and no mandatory sentence enhancement. Given the information missing in defendant's postconviction petition, as well as trial counsel's actions throughout the proceedings, we agree that no error can be found in the circuit court's dismissal of those three postconviction claims.

¶ 34    The second potential issue raised by OSAD was whether the circuit court committed manifest error when it denied defendant's remaining claim of ineffective assistance of counsel following the evidentiary hearing. That claim alleged plea counsel was ineffective for failing to keep defendant informed and knowledgeable about his case prior to his guilty plea, leaving him at a disadvantage when deciding between accepting the State's plea offer and insisting on a trial.

¶ 35    A defendant has a right to the effective assistance of counsel "during plea negotiations." *Missouri v. Frye*, 566 U.S. 134, 144 (2012). The *Strickland* test applies, but in order to show prejudice the defendant must show a "reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985). A "conclusory allegation" that defendant would not have pled guilty will not suffice. *People v. Valdez*, 2016 IL 119860, ¶ 29. Rather, defendant " 'must convince the court that a decision to reject the plea bargain would have been rational under the circumstances.' " *Id.* (quoting *Padilla v. Kentucky*, 559 U.S. 356, 372 (2010)).

¶ 36    Both defendant and plea counsel, Alfred Ivy, testified at the evidentiary hearing. The circuit court, as the trier of fact, was free to credit Ivy's testimony about his diligence in preparing for trial, his thought processes regarding witness credibility, sentence enhancements, and his handling of plea negotiations. See *People v. Domagala*, 2013 IL 113688, ¶ 34. Furthermore, the court found that none of the information alleged would have changed the defendant's decision to take the plea. The court found it would not have been "rational" for the defendant to reject the State's offer of 15 years and risk far lengthier sentences. Here, because prejudice is not shown, we hold there was no manifest error in the circuit court's denial of the claim following the evidentiary hearing.

¶ 37    OSAD's third, and final, potential issue was whether postconviction counsel provided the defendant with reasonable assistance. Under the Act, postconviction counsel is obligated to

13

provide a defendant with a reasonable level of assistance. *People v. Hardin*, 217 Ill. 2d 289, 299 (2005). In order to ensure this level of assistance is met, Illinois Supreme Court Rule 651(c) (eff. July 1, 2017) "outlines the specific duties of appointed counsel in post-conviction proceedings." *People v. Turner*, 187 Ill. 2d 406, 410 (1999). Rule 651(c) allows counsel to file a certificate stating they (1) "consulted with petitioner *** to ascertain his or her contentions of deprivation of constitutional rights," (2) "examined the record of the proceedings at the trial," and (3) made any amendments to the *pro se* petition "necessary for an adequate presentation of petitioner's contentions." Ill. S. Ct. R. 651(c) (eff. July 1, 2017). The filing of a certificate creates a rebuttable presumption that reasonable assistance was provided. *People v. Smith*, 2022 IL 126940, ¶ 29.

¶ 38     Here, defendant's postconviction counsel filed a Rule 651(c) certificate. Counsel's certificate complied with Rule 651(c), creating a rebuttable presumption that counsel provided reasonable assistance. We find nothing in the record that rebuts the presumption. As such, this potential issue has no merit.

¶ 39                                        CONCLUSION

¶ 40     None of the potential issues raised by OSAD are meritorious. Accordingly, we grant OSAD leave to withdraw as counsel and affirm the circuit court's order dismissing three claims in defendant's postconviction petition and the judgment denying the amended postconviction petition after holding an evidentiary hearing.

¶ 41     Motion granted; judgment affirmed.